Accordingly, for the above reasons, the Court finds for the defendant, Amerex Corporation.

The Court adopts this memorandum opinion as its findings of fact and conclusions of law, and the clerk of the Court is directed to prepare and enter the proper judgment in accordance with the Court's findings herein.

**TROPWOOD A. G., and Navicom Inc., Plaintiffs,**

v.

**HEMPEL'S MARINE PAINTS, INC., Defendant.**

**No. 74 Civ. 398.**

United States District Court, S. D. New York.

Aug. 5, 1977.

Kirlin, Campbell & Keating, New York City, for plaintiffs; Edward L. Smith, Jacques Jones, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant; Linda R. Blumkin, New York City, of counsel.

LASKER, District Judge.

This is an action for the sale of defective marine paint and negligent application of the paint to the M. V. Tropwood (the Tropwood). Plaintiffs are Tropwood A. G., a Swiss corporation which owns the Tropwood, and Navicom, Inc. (Navicom), a Wisconsin corporation which is, and at all relevant times was, the Tropwood's managing agent and operator. The defendant, Hem-

pel's Marine Paints, Inc. (Hempel Inc. or the defendant) is a New York corporation, licensed by J. C. Hempel/Hempel's Marine Paints of Copenhagen, Denmark, to use certain formulas and trademarks, including the trade name "Hempel's Marine Paints." It is part of a world-wide network of enterprises which manufacture and sell Hempel's Marine Paints.

Trial to the court without a jury has commenced. After the plaintiffs rested and midway through the presentation of its defense, Hempel Inc. suggested that the record was complete with respect to two issues of contract interpretation it believed to be conclusive in its favor and moved to dismiss the complaint. Because the issues are potentially dispositive of the case, and because what was to have been a two day trial had already ripened into a six day affair, trial was adjourned *sine die* and the motion taken under advisement. This memorandum constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

*The Motion to Dismiss*

Hempel Inc. moves to dismiss on two grounds. First, it claims that whatever contractual breach may have occurred in this case was committed not by it, but by one or more of its foreign affiliates, and that it is not legally responsible under the contract for the acts of its foreign affiliates. Second, it argues that even if it is liable for the alleged breach, the extent of its liability under the contract is limited to a warranty of merchantability of the product in container, and the plaintiffs' claims must therefore fail.

We conclude that the motion must be denied.

*The Factual Background*

On or about January 1, 1970 Navicom entered into a contract with Hempel Inc. for the purchase of paint for three vessels under its management, one of which was the Tropwood. Pursuant to this contract Navicom purchased Hempel's Marine Paints for the three vessels at various shipyards

throughout the world. When, in March 1972, the Tropwood proceeded to Rejeka, Yugoslavia for drydock, two Hempel's representatives were on hand to consult with regard to the appropriate Hempel brand paints and their application. One was from the newly opened Hempel's Yugoslavian affiliate, Hempel-Umag, and the other was from one of the Hempel organizations in Copenhagen. At this drydocking the entire bottom and boottop area of the hull were painted.

Approximately six weeks later, while the vessel was in Santos, Brazil, the master noticed that the paint was not adhering properly. Specifically, he reported that there was extensive peeling in the boottop area. In response to this report, Captain George Garrett, Navicom's Marine Superintendent, flew to Gijon, Spain, where he met the vessel in early June. He determined that another painting was required and arranged for the work to be done at a shipyard in Dunquerque, France. Drydocking, which took place from June 9th to June 12, 1972, was carried out solely for the purpose of repainting. Again, Hempel's representatives were on hand at the yard throughout the work and consulted with both Garrett and yard officials with respect to the proper paints and their application. Both the paint and the advisors were supplied on this occasion by Hempel Peintures Marine France S.A. (Hempel-France).

Within three weeks of the completion of this work, while the Tropwood was docked in Houston, Texas, the master again noticed that the paint was peeling. Garrett flew to Houston where samples of the paint were taken and sent for analysis. In the meantime the vessel continued trading, calling at ports in South America and Western Europe. In September it arrived in Antwerp, where further samples were taken and tests done. The problem continued to evade solution, however, and Garrett had decided at this point that it would be fruitless to drydock and repaint until a solution for, or at least a feasible hypothesis as to the cause of the peeling was found. However, on sailing from Antwerp the Tropwood had a collision in the English Channel which resulted in rather extensive damage to its starboard, and it became necessary to drydock for repairs. Accordingly, the vessel was drydocked in Santander, Spain, on October 9, 1972, and since the ship was out of water, Garrett arranged for a third painting.

Again, Hempel's was called and supplied both paint and a representative, Jose Antonio Docal, of Pinturas Marinas Hempel S.A.E. (Hempel-Spain). Docal was present at the drydocking and provided recommendations for the choice of paint, the painting schedule and the surface preparation. The paint job proved to be less than satisfactory to Navicom once more, however, and within a month peeling and chipping were again observed. Since the various laboratory tests had proven inconclusive, Garrett remained reluctant to drydock and repaint. The Tropwood continued in operation without new paint for almost a year and a half, when it was drydocked at Gdansk, Poland, in the normal course of maintenance and repair. At that time it was repainted with another brand, purchased in Poland.

*Discussion*

The contract document is a two-page printed form supplied by Hempel Inc. (PX 1). Adorned at the top with the Hempel trademark, page 1 of the document is entitled PURCHASE AGREEMENT between Hempel's Marine Paints, hereinafter called HEMPEL'S, and _____, hereinafter called the OWNER. Navicom's corporate name and address are typed into the blank space. Following this inscription are five, terse substantive provisions, the first two of which are relevant in part:

"§ 1. HEMPEL'S will supply such paints as the OWNER may order from HEMPEL'S factories and stocks according to the prices and conditions stated in this agreement.

§ 2. HEMPEL'S will visit ships calling at ports where they can supply . . ."

At the bottom of the page are two blank spaces for the signatories, labeled "OWNERS" and "HEMPEL'S MARINE

PAINTS," respectively. The contract is signed on Navicom's behalf by its Vice President, Hieronim Knap, and its corporate name and address are rubber-stamped over the owner's signature line. For Hempel's Marine Paints, the contract was signed by J. W. Chandler, General Manager of Hempel Inc., and over his signature appears the rubber-stamped corporate name and address of Hempel Inc.

Page 2 specifies that the contract relates to the supply of marine paint for three vessels husbanded by Navicom, the M.V. Tropical Veneer, the M.V. Tropical Plywood and the Tropwood. In addition, there is set forth a schedule of discounts to be granted on domestic purchases, a separate schedule for foreign deliveries and a single schedule of quantity discounts with respect to which foreign and domestic purchases are to be counted together.

*1. The defendant's liability for foreign transactions.*

Hempel Inc. argues that it is not liable for contract breaches on the part of its foreign affiliates. These are individual corporate enterprises, neither owned nor controlled by the defendant. They manufacture paint at their own factories and provide services through their own personnel. Although the common and preferred practice was for United States customers to place orders for both foreign and domestic deliveries with Hempel Inc. (see PX 77), purchases were in some cases made directly from the foreign companies.[1] In all cases the foreign affiliates invoiced buyers directly; and although payment was made to Hempel Inc. for all deliveries, the defendant separately recorded and segregated payments for foreign deliveries from those

for domestic sales and forwarded the former to the appropriate foreign supplier.

It is Hempel Inc.'s position that in light of these facts, its obligation under the contract was to supply paint in the United States, to notify its foreign affiliates of Navicom's orders for deliveries abroad and to include Navicom's foreign purchases in calculating the quantity discount. In essence, Hempel Inc. argues that insofar as the contract relates to transactions abroad, it signed merely as an agent for the various Hempel affiliated companies. Upon a careful review of the testimony and evidence, we cannot agree.

Turning first to the contract itself, there is no indication that Hempel Inc. is not a principal in the contractual relationship. One sufficiently versed in the intricacies of the Hempel's world-wide organization might note that throughout the document, all printed references are simply to Hempel's Marine Paints, a trade name.[2] It is a trade name under which the defendant does its business, however, and the defendant signed the document on the line labeled Hempel's Marine Paints. Over its signature it affixed the rubber-stamp containing its proper corporate title and address. It thus identified itself on the document as "Hempel's Marine Paints." There is nothing to suggest that in so signing the defendant acted in whole or in part as an agent for the foreign Hempel affiliates.

In the absence of an indication of agency on the face of the document, the inference is that Hempel Inc. signed as a principal. See Restatement (Second) of Agency, §§ 320–23 (1958). It has taken the position from the outset of the litigation, however, that "pursuant to long-standing

1. Captain Garrett testified that when he decided to drydock in Rejeka, he contacted Hempel Inc. by telephone from Italy, and then he also contacted Hempel-Umag directly. (Tr. 73–76) With respect to the Dunquerque and Santander drydockings, Garrett had no recollection of having contacted Hempel Inc. himself. He believes that his superiors at Navicom contacted Hempel Inc. (He was with the vessel in Europe when the decisions to drydock on these two occasions were made.) When he arrived

at each shipyard, the Hempel representatives were there. (Tr. 89–92; 127)

2. Hempel's Marine Paints is also the name of one of three Hempel's entities based in Copenhagen, Denmark. However, there is no indication that this is in any way a parent company which might reasonably be considered a principal on behalf of which Hempel Inc. or any other affiliate, would sign a contract for worldwide provision of paint.

practice known and assented to by plaintiffs [it] signed the contract . . . on behalf of itself and foreign companies affiliated with it." Answer, ¶ 3. Although Hempel Inc. is entitled to introduce evidence to show that this was, in fact, the understanding of the parties, Restatement (Second) of Agency, *supra,* § 323(3)(b), the record to date is barren of any indication that the plaintiffs were aware of the alleged practice or entered into the contract with any such understanding.

The circumstances surrounding the making of the contract and the parties' behavior during the course of performance support the conclusion that the defendant acted as a principal. There are many references to the world-wide nature of its business on letters, advertising circulars and solicitations sent out over the letterhead of Hempel Inc. On a printed price list reflecting only prices for domestic deliveries, the following legend appears directly under the defendant's full corporate name and New York addresses: "Systems and Services for Protection World-Wide." (PX 81) The theme that it is, in fact, an international operation is reinforced by constant references in the first person to foreign aspects of the business, such as references to "our prices" on overseas deliveries (PX 74) and "our modernized and streamlined factories [in Europe and the Mediterranean]" (PX 80). Indeed, in a letter dated December 31, 1969, in which he forwarded copies of the contract for Navicom's signature, a Hempel Inc. employee specifically assured Navicom with respect to the upcoming drydocking of the Tropwood at Maizuru, Japan, that "we have notified our Hempel personnel there." (PX 70)[3] In a general letter of solicitation over the defendant's letterhead, dated December 12, 1968, Chandler, of Hempel Inc., makes the following remarks:

"Only one company can provide a SYSTEM HEMPEL . . .. Years of research has enabled the HEMPEL organi-

zation to develope (sic) a superior line of protective coatings and conventional paints. The Hempel technical staff is always ready to assist in preparation of your painting specifications and to supply on the job assistance to insure that your SYSTEM HEMPEL is completed to maximum satisfaction . . .. *We . . stand ready to present to you the SYSTEM HEMPEL and our capabilities throughout the world.*" (PX 6) (Emphasis added)

The notations on this letter indicate that it was received and read by Knap, who signed the contract on Navicom's behalf one year later.

Although it received invoices directly from the various Hempel affiliates, Navicom settled almost all of its bills with Hempel Inc. (See PX 72, 73; Celkupa deposition at 29–37). When Navicom wished to arrange for the delivery of paint or technical services to one of its vessels in a foreign port, these arrangements were made through Hempel Inc. as well. The procedure was for Hempel Inc. then to notify the appropriate foreign company and place the order. (Celkupa deposition at 38–40). Hempel Inc. received copies of all internal Hempel's reports relating to the contract performance, such as the drydock reports filled out by the various Hempel's representatives who attended the drydockings in Rejeka, Dunquerque and Santander. Indeed, Garrett's testimony was that whenever trouble developed, his principal communications were with the New York firm. (Tr. 62–64, 72, 76, 89–91, 104–05, 112; see PX 25). After the failure of the second paint job at Dunquerque, there were several meetings at Navicom's headquarters in Milwaukee between Navicom personnel and Olander, Hempel and Thompson, three senior men at Hempel Inc. (Tr. 118–20) It was Hempel Inc., too, which received samples of paint chips from the Tropwood and wrote an extensive letter analyzing the reasons

---

**3.** The fact that some of these letters refer to "our associates or affiliates" world-wide, see e. g. PX 73, 79, in no way suffices to show that Navicom was aware that Hempel Inc.'s contractual role was limited as is now claimed.

The reference is at least neutral, and it is equally consistent with the interpretation that the defendant, as principal, would fulfill its commitments for foreign performance through its foreign affiliates.

for the failure, disclaiming responsibility. (PX 18A) Finally, throughout the drydocking in Santander, Hempel Inc. was in direct communication with Mr. Docal, the Hempel representative who attended the drydocking, and gave him express directions on how to proceed. It was Olander, for example, by this time well aware of Navicom's dissatisfaction and intention to hold his company liable for the paint failure, who directed Docal to put all his specifications for the paint job in writing and specifically to disclaim all warranties and responsibility for the success or failure of the work. (PX 58–P–1 through P–9; see PX 58 T 21; DX AS).

The facts of the transactions between Hempel Inc. and Navicom are thus inconsistent with the restricted reading of its contractual liability urged by the defendant. As there is nothing in the contract itself which reflects the refined limitations it now seeks to assert, (and, indeed, on its face the contract supports the opposite view), we conclude that however closely the position of Hempel Inc. may conform to the understanding of the Hempel's firms amongst themselves, it bears little resemblance to the reality of the contractual relationship here at issue.

## 2. The extent of the defendant's liability.

Hempel Inc. next argues that even if it is liable with respect to the foreign transactions, its liability is limited to a warranty of the quality of the product in container and the complaint should be dismissed insofar as it seeks recovery on any other ground.[4] The thrust of its argument is that the contract imposes no obligation on it to do anything more than supply paint. Specifically, it urges, the contract contains no express or implied warranties of any kind. This as-

pect of the argument is directed at plaintiffs' contention that Hempel's personnel improperly and negligently advised and supervised the paint selection process, surface preparation and paint application. Plaintiffs argue that the defendant was contractually obligated to oversee these aspects of the painting, or, even if it was not, that it did in fact undertake these tasks and is therefore accountable for the allegedly careless work.

 The evidence persuades us that as part of its contractual obligation, Hempel Inc. undertook to provide technical assistance and advice along with the supply of paint. Concededly, this is far from plain on the face of the contract, although Section 2 of that document does provide that "HEMPEL'S will visit ships calling at ports where they can supply." Whatever ambiguities may lie in the contract itself, the record is very clear that Navicom was led to believe by Hempel Inc. that it would supply this type of service. Hempel's advertising and promotional literature features this service prominently as an advantage of doing business with Hempel's. We have earlier referred to PX 6, a letter of solicitation from Chandler of Hempel Inc., dated December 12, 1968, which was received and read by Knap, of Navicom who negotiated the contract on its behalf a year later. In that letter Chandler assured the reader that "The Hempel technical staff is always ready to assist you in preparation of your painting specifications and to supply on the job assistance to insure that your SYSTEM HEMPEL is completed to maximum satisfaction." Chandler enclosed with PX 6 a brochure entitled System Hempel, written in the form of a letter from Mr. J. C. Hempel, the company's founder. In the

---

4. As we understand the case at this point, the practical result of acceptance of this argument would be dismissal of the entire complaint. The plaintiffs' case has been presented on the theory that although they are not able to pinpoint the cause of the paint failure, it had to be one of two things: defectively formulated paint or improper application, including choice of improper paints, poor surface preparation, inadequate drying times, etc. Both of these are, according to plaintiffs' theory, attributable to the defendant. If, as seems quite possible, the plaintiffs are unable to demonstrate that one or the other of these phenomena are more likely than not to have been the cause of the problem, the defendant's contention that it can in no event be held accountable for improper application would appear (if sustained) to be sufficient to warrant dismissal of the action.

final paragraphs of this brochure, under the heading "What is SYSTEM HEMPEL?," the author states that quality paint is a prime ingredient, and then goes on to say:

"But in my opinion it is just as important that the HEMPEL MAN is on the spot to give expert advice—again—around the world—and to supervise and assist in questions of surface preparation, application and cooperation with owner's, yard's, and contractor's technicians."

In addition to these excerpts from the defendant's advertising, there are numerous assurances in letters from Hempel Inc. to Navicom of such on the spot technical assistance. (See, e. g., PX 70, letter of December 31, 1969 in which copies of the contract were forwarded for signature, which states, "With reference to the forthcoming drydocking of the m/v Tropwood at Maizuru, we have notified our Hempel personnel there who will be readily at your disposal." And see PX 8, letter of December 19, 1969, stating, "Of course, Mr. Knap, our technical staff will be on hand during the drydocking of the 'Tropwood' to provide any technical assistance that may be required.") If any further evidence of the existence of Hempel Inc.'s commitment to provide such services were required, it is to be found in the fact that it did in fact provide such service at every single drydocking of the Tropwood subsequent to the effective date of the contract, including all three which are the subject of this suit, except for a 1971 drydocking in Japan. The failure to provide a Hempel man at that time was the subject of a sharply worded letter of complaint from Garrett to the Hempel Inc. offices. See DX W.

Hempel Inc.'s obligation to provide assistance is an obligation to provide skillful, competent assistance, and failure to do so will result in liability either in contract or in tort for any resultant damage. See *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, Doc. No. 75–7663 (2d Cir., July 13, 1977), slip op. at 4711. It is inappropriate, however, to characterize Hempel Inc.'s undertaking as a warranty, as plaintiffs have urged. Nothing in the contract or in any of the advertising or correspondence creates any warranties, express or implied, such as a warranty of fitness for a particular purpose.

Nor can we agree with plaintiffs that Hempel Inc. undertook, literally, to "supervise" the painting operation. Although there is language in the excerpt from the brochure entitled "SYSTEM HEMPEL," quoted above, which alludes to "supervision" by Hempel's representatives, the evidence indicates that their capacity at the drydockings was, and could only have been, more in the nature of advice or consultation. They worked at all times in cooperation with the owner's representative, Garrett, and the manager of the shipyard, both of whom had significant decisionmaking authority sufficient at least indirectly to affect the painting process.[5] Moreover, the actual labor was not done by Hempel employees. In short, Hempel's at no time controlled the work in a manner sufficient to render them liable for any and all subsequent paint failure, and the evidence indicates that no outside expert in defendant's position could have been reasonably expected to exercise such control. Accordingly, whatever recommendations the Hempel representatives made were given with certain implicit qualifications relating to the limitations of time, circumstances and available facilities beyond their control. This was the extent of their contractual obligation. As a result, Hempel Inc. may only be

---

**5.** It was Garrett, for instance, who selected the yard for drydocking. In all three instances in dispute, Garrett chose a yard without equipment or authority for sandblasting, which is often preferable to other means of surface preparation. This limited the scope of the Hempel representative in an important way in making recommendations for the work. The evidence also indicates that drydock space is often in heavy demand, with the result that shipyards are frequently unable to permit a vessel to remain in drydock as long as might be desirable. The record suggests, for instance, that three days was a rather short time in which to accomplish the painting undertaken at Dunquerque, a handicap which was increased by less than ideal weather. It is not apparent that Hempel's is responsible for the brief stay in drydock.

held accountable for failures demonstrably caused by erroneous or negligent advice, taking full account of all the surrounding circumstances.[6]

Accordingly, we find that the defendant was contractually obligated to supply skillful, competent and effective technical advice and services with respect to paint selection, surface preparation and application. However, its obligation did not amount to a warranty with respect to the success of the paint job. In order to recover, plaintiffs will have to demonstrate that the failures are in fact attributable to improper advice and assistance rendered by Hempel personnel, or, of course, to defectively formulated paint.

We have expressly refrained from attempting to resolve the merits on this issue. Although Hempel Inc. includes some such proposed findings in the material now before us, there is nothing equivalent from the plaintiffs and indeed, such material is beyond the scope of the present motions. The issue is complex and requires close analysis of the evidence, an analysis which would be inappropriate to undertake until the defendant has had an opportunity to complete the record with respect to the quality of the paint supplied, and both parties have fully briefed the issues.

For the foregoing reasons, the motions to dismiss are denied, except to the extent that the plaintiffs will be precluded from relying on a theory of warranty with respect to the rendering of technical advice and assistance.

It is so ordered.

---

**6.** A good example of the kind of error for which Hempel Inc. clearly could be held liable is provided in Olander's letter of August 18, 1972, in which he analyzed the paint failure and generally disclaimed responsibility for it. (PX 18A) On page 4, Olander concedes that a small part of the problem, at least, was attributable to the misadvice of the Hempel's man at Rejeka, and volunteered to supply free paint to correct the problem. He said, "It is clear, however, that our associates in Yugoslavia should have recommended HEMPALIN PRIMER in view of HEMPALIN RED LEAD in the belt to avoid peeling due to short interval, and considering this, we suggest that we at soonest opportunity supply to the vessel free paints for one half of the belt."